[900 NE2d 915, 872 NYS2d 364]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SHEL-
DON ENNIS, Appellant.

Argued October 15, 2008; decided November 20, 2008

404

**POINTS OF COUNSEL**

*Office of the Appellate Defender,* New York City (*Richard M. Greenberg* of counsel), for appellant. I. Defense counsel's conflict of interest deprived Sheldon Ennis of his constitutional right to the effective assistance of counsel where, as a result of that conflict, defense counsel failed to act on exculpatory evidence that could have resulted in a new trial, established Mr. Ennis's innocence in the shooting of Billy Moody, and altered Mr. Ennis's defense to the remaining charges in the case. (*People v Berroa,* 99 NY2d 134; *People v Longtin,* 92 NY2d 640; *People v Ortiz,* 76 NY2d 652; *People v McDonald,* 68 NY2d 1; *United States v Kliti,* 156 F3d 150; *United States v Levy,* 25 F3d 146; *Cuyler v Sullivan,* 446 US 335; *People v Alicea,* 61 NY2d 23;

*People v Brensic,* 70 NY2d 9; *People v Settles,* 46 NY2d 154.) II. Where defense counsel failed to timely raise a meritorious motion for a mistrial and severance based on his discovery of *Brady* material that the prosecution had never disclosed, and where defense counsel's failure was not the result of a legitimate strategic decision, Sheldon Ennis was denied the effective assistance of counsel. (*Strickland v Washington,* 466 US 668; *People v Benevento,* 91 NY2d 708; *People v Ortiz,* 76 NY2d 652; *People v Turner,* 5 NY3d 476; *People v Caban,* 5 NY3d 143; *People v Hobot,* 84 NY2d 1021; *People v Mahboubian,* 74 NY2d 174; *People v Bornholdt,* 33 NY2d 75; *People v Owens,* 22 NY2d 93; *People v Rivera,* 71 NY2d 705.) III. Where the prosecution failed to disclose significant *Brady* evidence that went directly to Sheldon Ennis's innocence in the Billy Moody shooting, and where defense counsel did not learn of that evidence until too late in the trial to take advantage of it, Mr. Ennis's convictions must be reversed. (*Brady v Maryland,* 373 US 83; *United States v Bagley,* 473 US 667; *Berger v United States,* 295 US 78; *People v Steadman,* 82 NY2d 1; *Banks v Dretke,* 540 US 668; *United States v Manning,* 56 F3d 1188; *Smith v Secretary of New Mexico Dept. of Corrections,* 50 F3d 801; *Bowen v Maynard,* 799 F2d 593; *People v Vilardi,* 76 NY2d 67; *People v Wright,* 86 NY2d 591.) IV. Where there was no evidence that Sheldon Ennis knew that anyone involved in the Randolph Sherman-Clarence Calwell incident was armed with a knife, no evidence that Mr. Ennis intended anyone to inflict physical injury on Sherman and Calwell by stabbing them, and no evidence that Mr. Ennis aided the actual stabbers in any way, his convictions for the assaults of Sherman and Calwell were obtained without legally sufficient evidence and must be reversed. (*Jackson v Virginia,* 443 US 307; *People v Contes,* 60 NY2d 620; *People v Piazza,* 48 NY2d 151; *People v Gerard,* 50 NY2d 392; *People v La Belle,* 18 NY2d 405; *People v Morales,* 130 AD2d 366; *People v Akptotanor,* 158 AD2d 694, 76 NY2d 1000; *People v Monaco,* 14 NY2d 43; *People v Rivera,* 176 AD2d 510.)

*Robert M. Morgenthau, District Attorney,* New York City (*Susan Axelrod* and *Patrick J. Hynes* of counsel), for respondent. I. The People did not fail to disclose *Brady* or *Giglio* material. (*People v Wright,* 86 NY2d 591; *Brady v Maryland,* 373 US 83; *People v Vilardi,* 76 NY2d 67; *People v Baxley,* 84 NY2d 208; *Giglio v United States,* 405 US 150; *People v Cwikla,* 46 NY2d 434; *United States v Bagley,* 473 US 667; *People v Bond,* 95 NY2d 840; *People v Sutherland,* 219 AD2d 523, 87 NY2d 908; *People v Clark,* 89 AD2d 820.) II. Defendant received effective

assistance of trial counsel. (*People v Pizarro,* 7 NY3d 840; *People v Bongarzone-Suarrcy,* 6 NY3d 787; *People v Ortiz,* 76 NY2d 652; *People v Tamayo,* 222 AD2d 321; *United States v Moree,* 220 F3d 65; *Cuyler v Sullivan,* 446 US 335; *People v Berroa,* 99 NY2d 134; *People v McDonald,* 68 NY2d 1; *United States v Kliti,* 156 F3d 150; *United States v Levy,* 25 F3d 146.) III. The People's evidence was more than sufficient to sustain defendant's assault convictions for the stabbings of Clarence Calwell and Randolph Sherman. (*People v Danielson,* 9 NY3d 342; *People v Schulz,* 4 NY3d 521; *People v Tejeda,* 73 NY2d 958; *People v Jackson,* 65 NY2d 265; *People v Bleakley,* 69 NY2d 490; *Matter of Erin C.,* 16 AD3d 320; *People v Wilson,* 240 AD2d 774; *People v Mitchell,* 77 NY2d 624; *People v Akptotanor,* 158 AD2d 694, 76 NY2d 1000.)

### OPINION OF THE COURT

GRAFFEO, J.

Defendant, his brother and a coconspirator were jointly tried and convicted of participating in a conspiracy to sell drugs and assaulting rival drug dealers to further the conspiracy. On appeal, defendant argues that his convictions should be reversed because his trial counsel failed to make appropriate use of potentially exculpatory information that he discovered during the trial. We agree with the Appellate Division that reversal is not warranted and we therefore affirm.

Sheldon Ennis, his brother Aaron, and coconspirator Keith Taylor were named in a 23-count indictment as participants in a drug selling conspiracy in which they used violence to keep rival drug dealers from encroaching on their territory. At the joint trial of the three men, the People offered proof that Sheldon and Aaron Ennis ran their operation—known as the "Dog Pound"—out of a hotel on 38th Street in Manhattan. The Ennis brothers allowed other groups to sell drugs in the vicinity but warned them to stay outside of a designated area in front of the hotel. Those who failed to heed the warning were severely punished, as demonstrated by the two violent incidents that led to the convictions Sheldon Ennis challenges in this appeal.

One such incident, which occurred in August 1996, involved Frank "Nitti" Brown who ran a competing drug operation adjacent to the Dog Pound territory. Brown testified at trial that, for many months, he had a peaceful relationship with the Ennis brothers. That changed when Brown antagonized the brothers by his decision not to use them as his supplier. Then,

one of Brown's workers crossed into Dog Pound territory and sold drugs near the hotel. The Ennis brothers confronted Brown about the transgression and a verbal altercation ensued. Brown retreated to his base of operations in the Bronx, intending to return with a group of armed associates the next day. Nonetheless, that evening he and Billy Moody drove down 38th Street, accompanied by two female acquaintances. Brown and Moody both testified that they were unarmed and did not intend to provoke a fight.

Brown recounted at trial that, as he proceeded down the street, he spotted Sheldon Ennis leaning against a telephone pole. Once Sheldon saw Brown's car, he raised a gun and began to shoot. Brown swerved and then observed Aaron on the opposite side of the street. Aaron also began firing at Brown's vehicle. A third conspirator—Keith Taylor—pointed a gun at the car, although Brown was not sure whether Taylor pulled the trigger. As they drove off, Moody told Brown that he had been shot. A couple of blocks away, Brown was able to locate a police car to report the shooting. He then sought medical assistance for Moody, who survived but was paralyzed as a result of the incident. The police retrieved numerous discharged shells and casings from the area of the shooting and, at trial, a ballistics expert testified that at least two and probably more guns were involved. In connection with this shooting, the Ennis brothers and Taylor were charged with attempted murder of Moody and several counts of assault and criminal possession of a weapon.

The second violent incident occurred four months after the Moody shooting—in December 1996—when the Ennis brothers were involved in another fracas with Clarence Calwell and Randolph Sherman, rival drug dealers who ran an operation down the street. Similar to the Brown incident, the dispute arose when one of the dealers who worked for Calwell and Sherman conducted a drug sale in Dog Pound territory. Sheldon and Aaron located the rival dealers and initiated a confrontation that resulted in Calwell and Sherman each suffering multiple stab wounds. Both brothers were charged with two counts of attempted murder in the second degree and multiple counts of assault.

The jury returned a verdict convicting defendant Sheldon Ennis of conspiracy in the second degree for his participation in the Dog Pound drug operation. In connection with the Moody shooting, the jury acquitted defendant of the attempted murder count but convicted him of assault in the first degree and crim-

inal possession of a weapon in the second and third degrees. Defendant was also acquitted of the two attempted murder counts arising from the stabbing of Sherman and Calwell but was convicted of one count of assault in the first degree and one count of assault in the second degree for the injuries they sustained.[1]

After the verdict but before sentencing, defendant's trial counsel—David Cooper—submitted a CPL 330.30 motion alleging that Sheldon's conviction for assault in the first degree as to the shooting of Billy Moody should be reversed based on a *Brady* violation. Cooper asserted that, during the trial, he learned that Aaron Ennis had participated in a proffer session with the District Attorney's office in which Aaron stated that he shot Billy Moody and that defendant was not present at the shooting. The People never turned over the statement as *Brady* material. Cooper explained that he was told about the statement in confidence and with the understanding that he would not disclose it until after the trial concluded. He claimed that, if the People had timely provided the *Brady* information, he would have sought a severance and a separate trial for defendant so that he could have called Aaron as a witness. Having learned of the statement late in the trial, however, Cooper contended there was no way he could get the statement before the jury because Aaron would have invoked his Fifth Amendment privilege against self-incrimination if Cooper had tried to call him as a witness at the joint trial.

The trial court denied the CPL 330.30 motion, reasoning that, although the People should have disclosed Aaron's statement, reversal was not warranted because defense counsel knew of the information during trial, at a time when he could have pursued various remedies (including an ex parte application to the court). The court concluded that defense counsel "tactically chose not to do anything" until after the jury reached its verdict, attempting "to use the Brady doctrine as both a shield and a sword." After the motion was denied, defendant was sentenced as a predicate felon to an aggregate term of 43⅓ to 60 years in prison.

Five years later, defendant made a CPL 440.10 motion to vacate the judgment, repeating his *Brady* argument and raising

---

1. Defendant was convicted of six out of the nine counts charged against him in the indictment: conspiracy in the second degree, two counts of assault in the first degree, criminal possession of a weapon in the second and third degrees, and one count of assault in the second degree.

an ineffective assistance of trial counsel claim. The motion was supported by the affidavit of David Cooper, Sheldon's trial attorney, who explained that it was Aaron's attorney who told him that, in an attempt to enter into a cooperation agreement with the People, Aaron stated that he shot Billy Moody and that defendant was not involved in the shooting. Cooper averred that, because he had promised Aaron's attorney that he would not disclose this information until the trial was over, he felt constrained not to alert the trial court. He further claimed that he had no "tactical or strategic reason" for his failure to act on the information during the trial. The motion court denied the application, echoing the reasoning of the trial court (2005 NY Slip Op 30328[U]).

The Appellate Division affirmed defendant's convictions, rejecting the ineffective assistance of counsel and *Brady* violation arguments for reasons similar to those articulated by the trial and motion courts (41 AD3d 271 [2007]). The court noted that there was no reasonable possibility that the People's failure to timely disclose Aaron's statement contributed to the verdict because there would have been no means for defendant to use the statement at trial, even if a severance had been granted, since Aaron would undoubtedly have invoked his Fifth Amendment privilege to avoid testifying on his brother's behalf. The court reasoned that any attempt to introduce the statement as hearsay through a third party present at the proffer session would have been unsuccessful because the statement did not fall within any hearsay exception, including the exception for declarations against penal interest. Finally, the Appellate Division also rejected defendant's claim that his assault convictions arising from the Calwell and Sherman incident were not supported by legally sufficient evidence. A Judge of this Court granted defendant leave to appeal (10 NY3d 810 [2008]).

██ ██ Defendant raises two ineffective assistance of trial counsel arguments. First, he contends that when Cooper made a promise to Aaron's counsel not to reveal information about Aaron's exculpatory statement until the trial ended, a conflict of interest was created and reversal is necessary because the conflict significantly impacted the defense. Second, he asserts that he did not receive meaningful representation because Cooper failed to appropriately act on the information he received from Aaron's lawyer during the trial. We conclude that both arguments lack merit.

Under the state and federal constitutions, a criminal defendant is entitled to the effective assistance of counsel, defined as

"representation that is reasonably competent, conflict-free and singlemindedly devoted to the client's best interests" (*People v Harris*, 99 NY2d 202, 209 [2002] [citations omitted]). A claim that defense counsel's representation was compromised by a conflict of interest requires two inquiries. First, the court must examine the nature of the relationship or circumstances that are alleged to establish a conflict. Second, if a conflict is identified, the court must determine whether the conflict "operated on the representation" (*People v Ortiz*, 76 NY2d 652, 657 [1990] [internal quotation marks and citations omitted]), i.e., whether the relationship or circumstances "bore a substantial relation to the conduct of the defense" (*People v Berroa*, 99 NY2d 134, 142 [2002] [internal quotation marks and citations omitted]).

To date, our conflict of interest cases have generally fallen into one of two categories: cases where a potential conflict of interest was identified based on defense counsel's previous or concurrent representation of a client whose interests conflicted with those of defendant (*see e.g. People v Abar*, 99 NY2d 406 [2003]; *People v McDonald*, 68 NY2d 1 [1986]) and cases where defense counsel became a witness against defendant (*see e.g. People v Lewis*, 2 NY3d 224 [2004]; *Berroa*, 99 NY2d 134 [2002]). Regardless of the circumstances, in our prior cases the potential conflicts of interest were discernible based on objective facts that were not easily subject to manipulation by the conflicted attorney. For example, in *Abar*, the purported conflict arose from defense counsel's former employment as a prosecutor who had been involved in prior prosecutions of defendant. In *Berroa*, defense counsel's out-of-court conversations with defense witnesses created the potential that she would become a witness against her client when those witnesses later gave alibi testimony contradicting what they had previously told her.

■ In this case, the purported conflict of interest does not arise from objective facts or circumstances external to defense counsel. Rather, it is alleged that defense counsel was torn between keeping a promise to Aaron's counsel not to reveal the exculpatory information and fulfilling his professional obligation to act in defendant's best interests. In the affidavit submitted in connection with the CPL 440.10 motion, Cooper stated that he did not tell the trial court about the alleged *Brady* violation or otherwise attempt to use the exculpatory information at trial because he felt constrained to remain silent, apparently based on his personal (as opposed to professional) ethical values.

The personal dilemma defense counsel describes is markedly different from the types of conflicts that we have previously

recognized as triggering our conflict of interest analysis because it is entirely subjective. Many (perhaps most) attorneys would not have perceived any conflict; having learned information that they deemed useful to their client, they presumably would have pursued one of several available courses of action, including advising the trial court, ex parte and without necessarily divulging their source, that they had reason to believe there had been a proffer session in which exculpatory statements were made. For these lawyers, any personal concern stemming from the assurance of confidentiality would have been outweighed by the professional obligation to pursue the interests of a client who was on trial for serious offenses, including attempted murder. We are therefore hard-pressed to place the internal struggle cited by defense counsel in the same category as the conflicts of interest discussed in our precedents.

Even if we viewed this case as presenting a conflict situation, reversal would not be warranted under the second prong of the inquiry. "Whether a conflict of interest operates on the defense is a mixed question of law and fact and, as a result, our review is limited. We may disturb an Appellate Division determination on this issue only if it lacks any record support" (*Abar*, 99 NY2d at 409 [citations omitted]). Here, the Appellate Division rejected the argument that defense counsel's failure to raise a *Brady* violation or to otherwise attempt to use the exculpatory information at trial was a result of the purported conflict. Defendant argues that this conclusion is unsupported by the record because defense counsel stated that he had no tactical or strategic reason for acting as he did. But the Appellate Division was not required to accept defendant's allegations at face value. Rather, in determining what motivated defense counsel, all of the circumstances surrounding the situation could be taken into account. In this case, we cannot say that the inference drawn by the Appellate Division (and the other two fact-finding courts) lacked any support in this record, particularly because, as addressed below, the actions defendant contends that his trial counsel should have taken would not have advanced his defense.

Defendant's related claim that defense counsel's performance fell below constitutionally adequate levels is also based on his assertion that his lawyer failed to appropriately use Aaron's statement—which he characterizes as *Brady* material—at trial. Where no conflict of interest is involved, the standard for assessing the effectiveness of trial counsel is whether the attorney provided meaningful representation. New York courts have

adopted a flexible approach that takes into account the fairness of the trial process as a whole and the totality of the representation (*see People v Benevento*, 91 NY2d 708 [1998]). Unlike the federal ineffective assistance standard, which requires a showing that, but for counsel's inadequacy, the outcome of the trial would have been different, New York courts do not conduct a strict prejudice inquiry (*see id.* at 713-714). However, this Court has held that it "would, indeed, be skeptical of an ineffective assistance of counsel claim absent any showing of prejudice" and that such a showing is "a significant but not indispensable element in assessing meaningful representation" (*People v Stultz*, 2 NY3d 277, 283-284 [2004]).

■ In this case, defense counsel performed as an effective advocate in many significant respects. He vigorously cross-examined the People's witnesses, gave a strong closing argument, and succeeded in obtaining acquittals on the most serious charges facing defendant—the three attempted murder counts (one relating to the Moody shooting and the others stemming from the stabbings of Calwell and Sherman). Defendant contends that counsel operated below the minimally-required level of effectiveness because he failed to preserve an objection to the purported *Brady* violation (or to seek a mistrial or severance based on the violation) and made no attempt to get Aaron's exculpatory statement before the jury. We disagree.

Defendant's claim that his trial should have been severed from Aaron's so that he could call Aaron as a witness is undermined by the fact that Aaron would undoubtedly have asserted his Fifth Amendment privilege against self-incrimination if this had occurred. Nor could defendant have called a witness who overheard Aaron's statement—such as Aaron's attorney—to testify as to its content because, in a trial against defendant, the statement would be hearsay not subject to any exception.

Defendant's allegation that the statement would be admissible through a third party under the exception for declarations against penal interest (DAPI) also fails. To qualify under this exception, the declarant must be unavailable, must have competent knowledge of the facts and must have known at the time the statement was made that it was against his or her penal interests (*People v Brensic*, 70 NY2d 9, 15 [1987]; *see People v Settles*, 46 NY2d 154, 167 [1978]). Even if these criteria are met, the statement cannot be received in evidence unless it is also supported by independent proof indicating that it is

trustworthy and reliable (*id.*). Here, only two of the DAPI criteria are present: Aaron would have been unavailable to testify on defendant's behalf because of his Fifth Amendment privilege and, since Aaron acknowledged (and independent evidence indicated) that he participated in the shooting, he would have had competent knowledge of whether defendant was also a participant.

The requirement that the statement be contrary to the declarant's penal interest, however, poses a problem since the part of the statement that defendant would have sought to admit—that defendant was not present at the time of the shooting—is not directly inculpatory of Aaron (*Brensic*, 70 NY2d at 16 [courts "admit only the portion of (the) statement which is opposed to the declarant's interest since the guarantee of reliability contained in declarations against penal interest exists only to the extent the statement is disserving to the declarant" (citations omitted)]). Moreover, given the context in which the statements were elicited, it is questionable whether Aaron would have viewed them as being against his penal interest. Aaron made the statements at the District Attorney's office, in the presence of his attorney, at a time when he was already being prosecuted for the offense and as part of a proffer in which he apparently sought to obtain an advantage, perhaps a plea bargain for himself or leniency for Sheldon, in exchange for his cooperation. As such, Aaron was in control of whether any statement he made could be used against him and, if it was, it would only be because he had reached an agreement with the prosecution that he deemed sufficiently valuable to justify such a result. Finally, an inculpatory declaration is not admissible under the fourth criterion unless there is "sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability" (*id.* at 15 [citation omitted]) and, in this case, no such proof has been identified.

Because Aaron could not have been compelled to testify on his brother's behalf and his statements would not have been admissible through a third party, defense counsel cannot be deemed ineffective for failing to seek a severance or to otherwise attempt to admit the statements into evidence. Nor can the representation be deemed constitutionally deficient based on defense counsel's failure to raise the *Brady* argument during

the trial.[2] While the People have an ongoing obligation to turn over exculpatory information—and their failure to do so in this case cannot be condoned—noncompliance with this requirement will not rise to the level of a *Brady* violation unless the evidence was material which, in New York, turns on whether the defense made a specific request for the information (*People v Vilardi*, 76 NY2d 67, 77 [1990]). Here, defense counsel sought disclosure of all statements made by participants in the crime that were exculpatory of defendant. As such, the People's failure to turn over Aaron's statement would be material if there is a "reasonable possibility" that the nondisclosure contributed to the verdict (*id.*). That standard is not met because, had the statement been turned over, there would have been no avenue for defense counsel to admit it into evidence, either in the joint trial of the Ennis brothers or in a separate trial of defendant had severance been granted.

As defendant acknowledges in his brief, it was not the content of Aaron's statement that was potentially valuable to the defense; if true, the fact that defendant was not present at the shooting would be a fact already known to defendant. In other words, this is not a case where the information might have opened a line of investigation for the defense that was not otherwise available. Rather, here it was the fact that Aaron made the statement that was significant. Defendant contends that, if the jury had learned that the actual shooter stated that defendant was not involved, this would be compelling evidence supplying reasonable doubt. While the impact of such testimony is debatable since jurors would have had ample reason to question Aaron's credibility given that he had an obvious motive to lie to protect his brother, a case could be made that, had the statement been admissible, there is at least a reasonable possibility that the outcome of the trial would have been different. But because there is no way that defendant could have presented the statement to the jury, this is a situation where the inadmissibility of the exculpatory information prevented it from being material, meaning its nondisclosure did not rise to the level of a *Brady* violation (*see e.g. People v Scott*, 88 NY2d 888

---

**2.** Although we discuss the *Brady* issue in connection with defendant's ineffective assistance of counsel claim, defendant's separate argument that reversal is warranted based on the purported *Brady* violation is not properly before this Court for review due to defense counsel's failure to preserve the issue by making a timely objection to the People's nondisclosure when he discovered it during the trial (*see People v Rogelio*, 79 NY2d 843 [1992]).

[1996]). As such, defense counsel's failure to preserve a *Brady* objection during the trial did not amount to ineffective assistance of counsel because an attorney is not deemed ineffective for failing to pursue an argument that had little or no chance of success.

Finally, we have considered defendant's challenge to the sufficiency of the evidence underlying the Calwell and Sherman assault convictions and find it to be without merit. There was ample evidence from which a rational jury could conclude beyond a reasonable doubt that the two brothers acted in concert and shared the intent to inflict the requisite degree of physical injury.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge KAYE and Judges CIPARICK, READ, SMITH, PIGOTT and JONES concur.

Order affirmed.