[923 NE2d 567, 896 NYS2d 284]

The People of the State of New York, Respondent, v George Konstantinides, Appellant.

Argued November 17, 2009; decided December 17, 2009

1

## POINTS OF COUNSEL

*Appellate Advocates,* New York City (*De Nice Powell* and *Lynn W.L. Fahey* of counsel), for appellant. I. Appellant was denied

the effective assistance of counsel when, without any inquiry, the court permitted a lawyer to continue representing appellant although he was burdened by a powerful incentive to conduct the defense in a way that minimized his own exposure to future criminal prosecution and disbarment. (*Strickland v Washington*, 466 US 668; *Cuyler v Sullivan*, 446 US 335; *People v Benevento*, 91 NY2d 708; *People v Berroa*, 99 NY2d 134; *People v Longtin*, 92 NY2d 640; *Wood v Georgia*, 450 US 261; *People v Gomberg*, 38 NY2d 307; *Holloway v Arkansas*, 435 US 475; *People v Macerola*, 47 NY2d 257; *People v Wandell*, 75 NY2d 951.) II. The sentence must be vacated and the matter remitted for resentencing because the court, which enhanced appellant's sentence based on a prior conviction appellant challenged on constitutional grounds, improperly refused to hold a hearing, as required by statute and fundamental due process. (*Burgett v Texas*, 389 US 109; *People v Harris*, 61 NY2d 9; *People v Love*, 71 NY2d 711; *Landau, P.C. v LaRossa, Mitchell & Ross*, 11 NY3d 8; *Matter of McGrath v Gold*, 36 NY2d 406; *People v Evans*, 94 NY2d 499; *People v Cruz*, 181 AD2d 906; *People v Ordine*, 130 AD2d 518; *People v Wright*, 119 AD2d 973; *People v Outley*, 80 NY2d 702.)

*Richard A. Brown, District Attorney,* Kew Gardens (*Karen Wigle Weiss* and *John M. Castellano* of counsel), for respondent. I. Defendant received effective assistance from conflict-free counsel. (*People v Ortiz*, 76 NY2d 652; *United States v Fulton*, 5 F3d 605; *People v Ennis*, 11 NY3d 403; *People v Longtin*, 92 NY2d 640, 526 US 1114; *People v Lombardo*, 61 NY2d 97; *People v Gomberg*, 38 NY2d 307; *People v Lewis*, 2 NY3d 224; *People v Berroa*, 99 NY2d 134; *People v McDonald*, 68 NY2d 1; *Cuyler v Sullivan*, 446 US 335.) II. Defendant's claim that he was improperly adjudicated a persistent violent felony offender is unpreserved for appellate review because he failed to present it to the sentencing court. In any event, defendant was properly adjudicated a persistent violent felony offender. (*People v Callahan*, 80 NY2d 273; *People v Hawkins*, 11 NY3d 484; *People v Ruz*, 70 NY2d 942; *People v Nieves*, 2 NY3d 310; *People v Hurley*, 75 NY2d 887; *People v Lemon*, 62 NY2d 745; *People v Proctor*, 79 NY2d 992; *People v Goodman*, 69 NY2d 32; *Ashe v Swenson*, 397 US 436; *People v Berkowitz*, 50 NY2d 333.)

**OPINION OF THE COURT**

READ, J.

Defendant George Konstantinides contends that he is entitled

to a new trial because he was deprived of his right to conflict-free representation. At a minimum, he argues, his sentence should be vacated because Supreme Court did not hold a hearing to determine the constitutionality of one of two prior felony convictions. For the reasons that follow, we reject both claims, and uphold defendant's conviction and sentence.

## I.

Defendant violated the conditions of his parole in 2003, which sparked issuance of a warrant for his arrest in June of that year. According to the People's witnesses at trial, in the early morning hours of December 20, 2003, the police learned that defendant was in a bar in Queens. They arrived just in time to see defendant follow another man out of the bar and get into a limousine parked at the curb. Defendant jumped into the passenger side, and the other man, later identified as G.T., got behind the wheel and started up the engine.

Several of the police officers approached the limousine on foot and directed G.T. to stop or shut off the engine. In G.T.'s account of what happened next, defendant retrieved a gun from a bag he was carrying and pointed the barrel at G.T., holding the gun low, near his waist. According to G.T., defendant said, "They're after me. If you don't move this limousine I'm going to kill you where you're sitting." Frightened, G.T. obeyed defendant's order. Traveling at speeds approaching 100 miles per hour, the limousine careened down city streets and eventually entered the Grand Central Parkway, pursued all the way by the police cars, their lights flashing and sirens sounding. During this high-speed chase, defendant fumbled the gun and accidentally fired a bullet into the limousine's dashboard.

Again in G.T.'s telling, defendant repeatedly instructed him to "[j]ust keep going," and that he would "tell [him] when this [was] going to come to an end." Near the 111th Street exit on the Grand Central Parkway, defendant ordered G.T. to pull over. As the car slowed, defendant jumped out, gun in hand. With three police officers in pursuit, he scrambled up an embankment into a wooded area. The officers testified that they saw "muzzle flashes" as defendant turned and shot multiple rounds in their direction; one officer returned fire. No one was injured, and defendant got away.

Detectives found defendant the next day in Manhattan, and arrested him; the gun shot off the night before was tucked in the back of his waistband. The People charged defendant with

attempted murder in the first and second degrees (Penal Law §§ 110.00, 125.27 [1]; §§ 110.00, 125.25 [1]); kidnapping in the first degree (Penal Law § 135.25); and criminal possession of a weapon in the second and third degrees (Penal Law § 265.03 [2];[1] § 265.02 [4][2]). On the first day of jury selection at defendant's subsequent trial, an attorney for whom he had worked for a time while on parole (hereafter, attorney number two) joined the defense team to "assist" the attorney who had represented defendant for the eight months preceding trial (hereafter, attorney number one).

After the People had presented the testimony of some police witnesses, the prosecutor informed the court out of the jury's presence that, during his interview of L.T., G.T.'s wife, he had acquired "information which . . . [might] bear on" attorney number two's "remaining at counsel table." He then related that L.T. had told him that defendant and attorney number two called her three times while defendant was incarcerated. L.T. claimed that, during one of these three-party calls, attorney number two asked her if G.T. would be willing to testify that the gun was his instead of defendant's. When L.T. answered that her husband would not say this because it was not true, attorney number two was alleged to have replied that the defense was going to be "that the gun was your husband's and if he doesn't agree with that, then we're just going to go ahead and say that it was his."

According to the prosecutor, L.T. further related that, during a subsequent three-party call, attorney number two threatened that

> "the defense was going to pay a woman named Jennifer, who . . . supposedly had some sort of extramarital affair with [G.T.] during the course of his marriage to [L.T.], to say that [G.T.] was doing drugs with [her], all during the day and that the gun was [G.T.'s] and that they were going to do that so that [L.T.] might want to distance herself from . . . [G.T.]."

Finally, L.T. informed the prosecutor that she was offered a

---

**1.** Effective December 21, 2005, this provision of the Penal Law was redesignated section 265.03 (1) (b).

**2.** This provision of the Penal Law was repealed, effective November 1, 2006. Possession of a loaded, operable firearm outside of a person's home or place of business, with certain exceptions, is now criminal possession of a weapon in the second degree, a violation of Penal Law § 265.03 (3).

diamond ring if she left her husband and married defendant because it would "look good for . . . defendant that [L.T.] had left [G.T.] . . . and had now come to be with" him. L.T. was said to have refused this overture, telling attorney number two and defendant "[a]bsolutely not and stop calling."

The prosecutor explained that, as an officer of the court, he felt obligated to convey this information to the judge. He added that while he did not know the defense's strategy, attorney number one's opening statement suggested that defendant intended to attack G.T.'s credibility. The prosecutor continued that if defendant

> "claim[ed] through cross-examination or through the potential calling of witnesses that the gun was [G.T.'s] and not the defendant's, and/or if he . . . interpose[d] some sort of a defense about [G.T.'s] doing drugs during the course of the day, firstly . . . based upon these conversations which [L.T.] . . . allegedly had with [the second attorney], . . . there would be no good-faith basis to proffer that defense; and, secondly, if they were to proffer such a defense, . . . [the prosecution sh]ould be permitted to call [L.T.] to show recent fabrication."

The prosecutor noted that if this scenario, in fact, developed, the second attorney's "credibility would certainly become an issue" and "he would become a potential witness in the case." As a result, the prosecutor asked the trial judge to disqualify attorney number two and "have the defendant proceed with just [attorney number one]."

When the trial judge asked attorney number two if he wanted to respond, attorney number one interjected "[m]ay we have one second, please?" After a pause, the judge then asked attorney number two if he wanted to deal with these matters after the upcoming lunch recess. Attorney number one again jumped in, telling the judge that "I think that will be good . . . just because there are a couple of issues. First, I'd like to find out the factual scenario of any of these phone calls, and secondly, see what possible legal basis there would be to disqualify or preclude a potential line of argument on defense."

The trial judge then remarked as follows:

> "Initially[,] disqualifying an attorney during the course of a trial is [a] very difficult thing to do. I've only had representations by counsel, secondhand

representations; I haven't had a hearing on the issue.

"Beyond that, these are serious allegations and if they are pressed could certainly lead to disbarment proceedings, because, [attorney number two], allegations of suborning perjury and bribery are serious.

"I don't know if you should discuss how you want to proceed. [Attorney number one] has done all the work at this point, whether you wish to continue at counsel table and, perhaps, these matters might be injected into the trial at some point.

"Decide, as a question of strategy, first what you want to do."

When the trial resumed, the court apologized to the jury for "these delays," and the prosecutor called G.T. to the witness stand. The second attorney remained at the defense table. The record does not disclose the substance of further discussions that the court must have had with the parties to resolve the prosecution's application to disqualify attorney number two.

Attorney number one cross-examined G.T. He focused on G.T.'s relationship with defendant, and sought to undermine his insistence that he and defendant were mere acquaintances. Attorney number one's cross-examination showed that G.T. shared a lot of information about his personal life with defendant, including his history of drug abuse; that G.T. stayed with defendant in his apartment when estranged from L.T.; and that he told defendant that he had been convicted of illegally possessing a firearm and was on probation. Attorney number one also brought out that, after defendant's arrest in this case, G.T. (and L.T.) twice visited defendant in jail. He questioned G.T. about whether he kept a gun in his limousine to protect himself, and whether he was "high" on December 20, 2003, evoking adamant denials. Attorney number one also elicited testimony to point out to the jury that G.T. knew he would face prison time if found in possession of a gun on December 20, 2003.

Defendant testified in his own behalf; he was examined by attorney number two, whom he addressed familiarly, by his first name. Defendant acknowledged that he was aware on December 20, 2003 that he was wanted by the police, and that he was at the time running an illegal bookmaking business. He operated this business out of an office in the basement of an apartment

in Astoria and G.T.'s limousine, which he called his "moving office." He explained that both G.T. and L.T. worked for him: G.T. drove him around to pick up betting "tickets" at neighborhood bars and strip clubs, and L.T. acted as his "secretary" by answering and placing phone calls while sitting next to her husband in the limousine's front seat. Defendant asserted that G.T. kept guns in his limousine for protection whenever he ferried rap entertainers around, as he was doing on the night of December 19, 2003 before linking up with defendant at about 2:00 A.M. on December 20th.

Defendant maintained that he did not believe the police were after him when they approached the limousine. He claimed that it was G.T.'s idea to flee because G.T. knew he would get in trouble if picked up by the police with a gun in his limousine. According to defendant, he offered to take G.T.'s gun and run from the police on foot, and the gun accidentally discharged when G.T. reached under the front seat to retrieve it and slide it over the seat to him with his right hand, while steering the limousine with his left hand. Defendant explained that, as he headed into the woods, he heard shots, and so fired one round in the air to slow down the police officers chasing after him. Defendant professed that he intended to return the gun to L.T. (he assumed G.T. had been arrested), who did not return the telephone calls he made to her while on the lam, or give it to a lawyer. He acknowledged that he knew the gun was loaded and operable when he fled with it, and that he had the same loaded gun in his waistband when arrested the next day. Defendant also told the jury that when he volunteered to flee the limousine with the gun, he did not appreciate the full consequences of getting caught by the police with a loaded firearm when he had so many prior felony convictions.

The jury convicted defendant of both weapon counts, and acquitted him of kidnapping. After the jury failed to reach a verdict on attempted murder, the court declared a mistrial on those counts, which were later dismissed.

Prior to sentencing, the People filed a persistent violent felony offender statement pursuant to Criminal Procedure Law § 400.16. The statement listed two prior violent felony convictions that, with tolling, fell within 10 years of defendant's commission of the crimes he was convicted of in this case—a 1989 conviction for second-degree attempted murder and a 1996 conviction for second-degree assault. At the sentencing hearing, defendant, represented by attorney number two (attorney

number one was actually engaged at a parole hearing at the time), challenged the constitutionality of these two prior felony convictions on the ground that he was innocent,[3] that his guilty pleas had been coerced, and that he had been deprived of effective assistance of counsel. He identified numerous people whom he wished to call as witnesses, including attorney number two. Supreme Court denied defendant's constitutional claims without a hearing; adjudicated him a persistent violent felony offender; and sentenced him to concurrent indeterminate prison terms of 25 and 20 years to life on the second- and third-degree weapon convictions respectively.

On appeal, defendant argued ineffective assistance of counsel because of a conflict of interest with attorney number two, and that he was improperly adjudicated a persistent violent felony offender because he was denied a hearing to challenge the 1996 conviction on constitutional grounds. With respect to the former, the Appellate Division held that defendant did not establish that the alleged "potential conflict of interest . . . affected the conduct of his defense" (*People v Konstantinides*, 55 AD3d 752, 753 [2d Dept 2008]). The court adjudged defendant's claim that he was entitled to a hearing to determine his status as a persistent violent felony offender to be unpreserved and, in any event, meritless. A Judge of this Court granted defendant permission to appeal (12 NY3d 759 [2009]), and we now affirm.

## II.

We have held that, where a defendant makes a conflict-based claim of ineffective assistance of counsel, two questions arise. First, the court must determine whether there was a potential conflict of interest (*People v Abar*, 99 NY2d 406, 409 [2003]). Second, a "defendant must show that the conduct of his defense was in fact affected by the operation of the conflict of interest, or that the conflict operated on the representation" (*People v Ortiz*, 76 NY2d 652, 657 [1990] [internal quotation marks omitted]). As we have repeatedly held, "[w]hether a conflict of interest operates on the defense is a mixed question of law and fact and, as a result, our review is limited. We may disturb an Appellate Division determination on this issue only if it lacks any record support" (*Abar*, 99 NY2d at 409, citing *People*

---

**3.** This stands in stark contrast to defendant's testimony at trial in this case, where he told the jury that he pleaded guilty to the prior felonies that he was accused of committing "[b]ecause I was guilty of every one of th[ose] crimes."

*v Berroa*, 99 NY2d 134, 142 [2002], *People v Harris*, 99 NY2d 202, 210 [2002], and *People v Ming Li*, 91 NY2d 913, 917-918 [1998]). Here, the second attorney's continued representation of defendant created a potential conflict of interest; however, there is record support for the Appellate Division's determination that defendant failed to establish that the conflict operated on the defense.

First, defendant was fully informed of the potential conflict. The prosecutor set out the allegations against the second attorney, and he told the court and defendant exactly what steps he might take if the defense "claim[ed] through cross-examination or through the potential calling of witnesses [e.g., Jennifer] that the gun was [G.T.'s] and not the defendant's, and/or . . . interpose[d] some sort of a defense about [G.T.'s] doing drugs during the course of the day": he might call L.T. to describe the three-party conversations. And, of course, according to L.T., defendant himself participated in those conversations.

Neither defendant nor the first attorney, who did not suffer from any alleged conflict, complained that the second attorney's continued representation of defendant operated on the defense. The defense pursued, through its questioning of G.T. and/or defendant, the "claim . . . that the gun was [G.T.'s] and not the defendant's, and . . . [that G.T. was] doing drugs during the course of the day." In other words, the existence of a potential conflict did not, as defendant argues on appeal, cause the second attorney to "relinquish[ ] this avenue of defense in order to minimize the risk" he faced if the prosecutor called L.T. to refute the claims as recently fabricated lies in which the second attorney was complicit. And the prosecutor, in fact, never called L.T. despite his warning that he might under these circumstances.

Second, defendant was simultaneously represented by conflict-free counsel who was "singlemindedly devoted to [his] client's best interests" (*Harris*, 99 NY2d at 209). The first attorney had represented defendant for the eight months preceding trial, during which he handled all the plea negotiations and pretrial motions. The first attorney conducted voir dire, delivered the opening statement, cross-examined all of the People's witnesses, and gave the closing argument. There is no suggestion that the first attorney's loyalty to defendant was compromised. In light of the first attorney's active participation, defendant has failed to establish that the potential conflict

with the second attorney operated on the defense such that he is entitled to a new trial (*see People v Jacobs*, 6 NY3d 188, 190 [2005]).

■ Nevertheless, defendant argues that he met his burden because the second attorney, who presented the defense case, had to decide which witnesses to call and what questions to ask them, knowing that those decisions could affect his livelihood and liberty. But defendant does not point to any evidence elicited by the second attorney that was harmful to him. Although he claims that the second attorney did not present evidence that would have been helpful to his defense, his allegations on this score are entirely speculative and unsubstantiated.

Specifically, defendant argues that the second attorney's conflict prevented him from calling Jennifer, who would have testified about her affair with G.T., that the gun belonged to G.T., and that G.T. abused drugs on the day of the incident. But Jennifer was not on the defense's witness list; she was never mentioned as a possible witness during the first attorney's opening statement. In short, there is no reason to believe that the prosecutor's application to disqualify the second attorney dissuaded the defense from calling Jennifer. The defendant has never attempted to show that Jennifer actually exists, and was willing to provide truthful and beneficial testimony. Surely he cannot be heard to complain if an effort to present perjured testimony was thwarted. While the record on appeal is insufficient to establish that Jennifer might have given relevant and honest testimony, nothing prevented defendant from raising an ineffective assistance claim in a Criminal Procedure Law § 440.10 motion. Such a motion could have included an affidavit in which Jennifer explained the substance and significance of her evidence.[4]

---

4. The dissent chastises the majority for holding defendant to his burden to show that the conflict operated on the defense given that, at the time of trial, defendant was still represented by counsel subject to a potential conflict of interest (dissenting op at 17). But our cases have repeatedly held defendants to this burden (*see People v Longtin*, 92 NY2d 640, 644 [1998] [to prevail on conflicted counsel claim "defendant must demonstrate that 'the conduct of his defense was in fact affected by the operation of the conflict of interest,' or that the conflict 'operated on' counsel's representation" (quoting *People v Alicea*, 61 NY2d 23, 31 [1983])]; *see also People v Smart*, 96 NY2d 793, 795 [2001]; *People v Ortiz*, 76 NY2d at 657; *People v Lombardo*, 61 NY2d 97, 102-103 [1984]). That a defendant might have to pursue such a claim, which relies on information that is not on the record, by means of a Criminal Procedure Law § 440.10 motion, in which he can establish any existing facts to support

■ Nor does the absence of an on-the-record inquiry require reversal. While it surely would have been better practice for the trial judge to place on the record the follow-up discussions that must have taken place after the prosecutor's application (*see People v Gomberg*, 38 NY2d 307, 312 [1975]), the court's neglect to do so does not relieve defendant of his obligation to demonstrate that the potential conflict actually operated on the defense (*see e.g. People v Smart*, 96 NY2d 793, 795 [2001]; *People v Longtin*, 92 NY2d 640, 644 [1998]; *People v Monroe*, 54 NY2d 35, 39 [1981]).

■ Next, although defendant does not have to show that the conflict affected the trial's outcome, any potential conflict between defendant's and the second attorney's interests, in fact, had no impact on defendant's conviction for firearms crimes. He was acquitted of kidnapping—the only charge where any truthful testimony from Jennifer casting doubt on G.T.'s credibility would have been relevant—and the attempted murder charges were ultimately dismissed after the jury failed to reach a verdict on those counts. Police officers placed defendant in the limousine's passenger seat; police officers also identified defendant as the individual who fired a gun at them, and defendant was arrested the day after the chase with the same loaded gun in his possession. Any possible testimony from Jennifer that the gun belonged to or was owned by G.T. would not negate this evidence, which conclusively established that defendant possessed a weapon with the intent to use it, and thus was guilty of the firearms crimes that he was convicted of committing. Indeed, defendant himself admitted under oath to having engaged in the conduct underlying these crimes (*see People v Seale*, 47 NY2d 923, 925 [1979]).

Finally, defendant urges us to embrace a per se rule mandating reversal in situations where a defense attorney is accused of criminal misconduct directly related to the representation of the defendant. In support of such a per se rule, defendant points to decisions from the United States Court of Appeals for the Second Circuit (*see United States v Fulton*, 5 F3d 605, 610-611 [2d Cir 1993]; *United States v Cancilla*, 725 F2d 867, 871 [2d Cir 1984]). These cases are not controlling (*see People v Kin Kan*, 78 NY2d 54, 59-60 [1991]) and, in any event, are

his claim, is also nothing new. Indeed, that is precisely what the defendants in *Alicea* and *Ortiz* did. Accordingly, to the extent that the record is devoid of facts to support defendant's claim, that is the fault of defendant, whose burden it is to establish that the conflict operated on the representation.

distinguishable. In both *Fulton* and *Cancilla*, the defense attorneys were alleged to have committed crimes related to those for which their clients stood trial. In this case, there is no allegation that the second attorney was involved in defendant's violent encounter with the police, or possession of the gun; defendant was not on trial for witness tampering, or bribery, or suborning of perjury arising from his alleged contacts with L.T.

Moreover, we have repeatedly declined to create a rule of per se error (*see e.g. People v Recupero*, 73 NY2d 877, 880 [1988]; *People v McDonald*, 68 NY2d 1, 11-12 [1986]). Defendant's proposed rule would require automatic reversal upon mere accusations of impropriety, whether true or false and regardless of whether the attorney's loyalties were actually divided. In our view, such a per se rule is not necessary to protect a defendant's right to conflict-free representation. Under our precedent, a defendant does not have to establish that the conflict affected the outcome of the proceedings; a defendant must only show that the conflict operated on the defense. Here, defendant failed to make even this minimal showing.

### III.

Criminal Procedure Law § 400.16 (2) states that the method for determining whether a person is a persistent violent felony offender is governed by Criminal Procedure Law § 400.15. This procedure honors the principle that a "conviction obtained in violation of one's constitutional rights may not be used to enhance punishment for another offense" (*People v Harris*, 61 NY2d 9, 16 [1983]). To this end, the defendant must be given a statement informing him of the date and place of his predicate convictions, and an opportunity to controvert any allegations within that statement (CPL 400.15 [3]). A defendant who wishes to controvert the allegations "must specify the particular allegation or allegations he wishes to controvert" or they are deemed admitted (*id.*). And a defendant may "controvert an allegation with respect to" a prior conviction on the ground that it was unconstitutionally obtained "at any time during the course of the hearing hereunder" (*see* CPL 400.15 [7] [b]).

Where the "uncontroverted allegations . . . are sufficient to support a finding that the defendant has been subjected to a predicate violent felony conviction the court must enter such finding" and sentence defendant accordingly (CPL 400.15 [4]). Where the "uncontroverted allegations . . . are *not* sufficient to support [such] a finding" the court must hold a hearing (CPL

400.15 [5] [emphasis added]). At the hearing, the People are required to prove the defendant's predicate status "beyond a reasonable doubt by evidence admissible under the rules applicable to a trial of the issue of guilt" (CPL 400.15 [7] [a]), but not the prior conviction's constitutionality (*People v Diggins*, 11 NY3d 518, 524 [2008]). Once the fact of the prior conviction has been established, it is the defendant's burden to allege and prove facts to establish his claim that the conviction was unconstitutionally obtained (*Harris*, 61 NY2d at 15).

Defendant argues that, once he asserted that his 1996 conviction was unconstitutionally obtained, these statutory provisions required the court to hold a hearing in which he could call witnesses. But to obtain a hearing, a defendant must do more than make conclusory allegations that his prior conviction was unconstitutionally obtained. He must support his allegations with facts (*People v Gordon*, 251 AD2d 93 [1st Dept 1998]; *People v Greco*, 230 AD2d 23, 31 [4th Dept 1997]).

Here, defendant stated only that he wanted to call numerous witnesses who, he claimed, would demonstrate that his "guilty pleas were coerced" and that his attorney was "ineffective." But defendant did not explain how his guilty pleas were coerced or in what way his attorney was ineffective. Nor did defendant indicate what information the named witnesses would provide on these issues. These unsupported allegations were insufficient to entitle defendant to a hearing on the constitutionality of his prior conviction.

Accordingly, the order of the Appellate Division should be affirmed.

SMITH, J. (dissenting in part). During defendant's trial, one of his lawyers was accused in open court of joining with defendant in attempts to suborn perjury and to bribe a potential witness. Under a number of federal cases, this accusation, true or false, would be enough to create a per se, unwaivable, conflict requiring disqualification of the lawyer or, failing that, reversal of defendant's conviction (*see e.g. United States v Jones*, 381 F3d 114 [2d Cir 2004]; *United States v Fulton*, 5 F3d 605, 609-610 [2d Cir 1993]). I agree with the majority in rejecting this rule. In other words, I would hold that the conflict could be waived, or that, even if not waived, the failure to disqualify the lawyer would not justify reversal if it had no effect on defendant's representation.

But here, the trial court never asked defendant whether he

would waive the conflict, much less conducted the hearing necessary to assure that any waiver was knowing and intelligent (*see People v Gomberg*, 38 NY2d 307 [1975]). Nor did the trial court inquire at all, so far as the record shows, into the prosecutor's allegations or their possible impact on the trial. The prosecutor's motion to disqualify was never ruled on, and the conflicted lawyer continued to participate, in a significant way, in defendant's defense. Under the circumstances, I do not see how we can affirm defendant's conviction without at least requiring a post-trial hearing into whether the conflict operated on the representation.

Our recent decision in *People v Ennis* (11 NY3d 403, 410 [2008]) explains the framework we use to decide issues like this:

> "A claim that defense counsel's representation was compromised by a conflict of interest requires two inquiries. First, the court must examine the nature of the relationship or circumstances that are alleged to establish a conflict. Second, if a conflict is identified, the court must determine whether the conflict operated on the representation, i.e., whether the relationship or circumstances bore a substantial relation to the conduct of the defense." (Internal quotation marks and citations omitted.)

When a lawyer is accused (rightly or wrongly) of criminal conduct related to the subject matter of the case against his client, the first *Ennis* test is met—the "relationship or circumstances" establish a conflict. The reasons are explained in the federal cases (*see e.g. United States v Jones*, 381 F3d at 120): Any lawyer, guilty or innocent, in the situation faced by defendant's lawyer here would recognize that his personal interests were very much at stake, and would feel a strong need to protect himself—a goal that might not be consistent with protecting his client. Thus, it cannot be said here, as we said in *Ennis*, that "[m]any (perhaps most) attorneys would not have perceived any conflict" (11 NY3d at 411). There are few, if any, lawyers who could easily disregard the possibility of disbarment or criminal proceedings against them personally, even if their client's interests demanded it.

The second step in the *Ennis* analysis is to determine whether the conflict "operated on the representation." The trial court here never took this step. As a result of this error, the record before us is silent as to whether there are witnesses who might have been called, questions that might have been asked, or

strategies that might have been pursued if defendant's lawyer's personal interests had not been threatened.

Specifically, we have no way of knowing whether defense counsel ever really considered calling the "woman named Jennifer" (*see* majority op at 6) as a witness; it may well be that Jennifer, if she existed, could have given no testimony (other than testimony known to be perjured) that would have helped defendant, but nothing in this record proves that. Also, while L.T., the source of the prosecutor's information about defendant's lawyer, did not testify, her name came up both in the direct examination of defendant (conducted by the lawyer accused of wrongdoing) and on the prosecutor's cross-examination. The record does not show whether the lawyer would have handled this subject differently if L.T. had not been his accuser. And there is nothing to show whether an offer to provide information to the People as part of a plea or sentence bargain was a realistic option for defendant. If it was, it would surely have been hard for the lawyer—knowing it at least possible that defendant would provide information about the lawyer himself—to give impartial advice on the subject.

Astonishingly, the majority makes the absence from the record of necessary information—the consequence of the trial court's failure to conduct stage two of the inquiry *Ennis* requires—a basis for *affirming* defendant's conviction. The silence of the record, it says, is "the fault of defendant, whose burden it is to establish that the conflict operated on the representation" (majority op at 12-13 n 4). The flaw in this assertion seems almost too obvious for statement: How was defendant supposed to meet that burden while represented by the very counsel who was subject to the conflict? The majority seems to suggest three possible answers to this question, all completely unsatisfactory.

First, the majority notes (majority op at 11-12) that the conflicted lawyer sat in the second chair at the trial, and that the lead lawyer had no apparent conflict. Thus, the majority implies, the silence of the record is "the fault of defendant" because his lead counsel did not attack his own co-counsel's fitness to continue in the case. But no authority supports, and simple common sense contradicts, the idea that defendant may be blamed for his lawyer's failure to attack his colleague.

Secondly, the majority surmises that there "must have" been an off-the-record conference, in which the concerns raised by

the prosecutor's application to disqualify were resolved (majority op at 8). But even in off-the-record discussions, defendant was represented by the same conflicted counsel—and in any event, can it be doubted that, where the record shows an apparent impairment of a defendant's right to conflict-free representation, the problem must be resolved on the record, not off it?

Thirdly, the majority suggests that defendant's remedy was a post-trial motion under CPL article 440 (presumably to be made after defendant obtained new counsel) (majority op at 12). The majority cites no authority holding that a post-trial motion is necessary to obtain relief for an error apparent on the face of the trial record—no doubt because the law is to the contrary. We held in *People v Crump* (53 NY2d 824, 825 [1981]):

> "[I]nasmuch as both the trial court's failure to make any inquiry and the conflict of interest between defendant and Barclay are discernible from the record, the question of whether defendant was deprived of the effective assistance of counsel is appropriate for resolution on defendant's direct appeal from his conviction. While it is true that claims of ineffective assistance of counsel often involve factual questions which can best be addressed in a collateral or post-conviction proceeding brought under CPL 440.10 (*see People v Brown*, 45 NY2d 852, 854), where, as here, the record discloses that reversible error has occurred below, defendant should not be relegated to such collateral proceedings to obtain relief."

Where a defendant claims that his lawyer was conflicted, but the record contains no evidence of a conflict, that evidence must be supplied in a post-trial motion (*see People v Mora*, 290 AD2d 373 [1st Dept 2002]; *People v Frias*, 250 AD2d 495 [1st Dept 1998]). But here, the record shows both the conflict and an error by the trial court in dealing with it, as the majority essentially concedes (*see* majority op at 13 [to address the issue on the record "surely would have been better practice"]). For me, the only difficult issue in this case is what remedy for this error defendant is entitled to. I am prepared to hold that he is not entitled to a new trial, but only to a hearing on the issue of how, if at all, the apparent conflict affected his representation. But I find the majority's holding that he is entitled to no remedy at all indefensible.

Judges Graffeo, Pigott and Jones concur with Judge Read; Judge Smith dissents in part in a separate opinion in which Chief Judge Lippman and Judge Ciparick concur.

Order affirmed.