*Cortez v. Kopp*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 6th day of November, two thousand twenty-five.

PRESENT:

>DENNY CHIN,
>RICHARD J. SULLIVAN,
>BETH ROBINSON,
>>*Circuit Judges.*

_____

PAUL CORTEZ,

>*Petitioner-Appellant*,

>v.                                                                              No. 24-2376

MARLYN KOPP, SUPERINTENDENT OF SING
SING CORRECTIONAL FACILITY,

*Respondent-Appellee.*[*]

_____

|  |  |
|---|---|
| **For Petitioner-Appellant:** | RANDALL D. UNGER, Kew Gardens, NY. |
| **For Respondent-Appellee:** | BRENT YARNELL, Assistant District Attorney (Steven C. Wu, Chief, Appeals Division; Stephen J. Kress, Chief, Federal Habeas Corpus Unit, *on the brief*), *for* Alvin L. Bragg, Jr., District Attorney for New York County, New York, NY. |

Appeal from a judgment of the United States District Court for the Southern District of New York (Paul A. Engelmayer, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the August 9, 2024 judgment of the district court is **AFFIRMED**.

Paul Cortez appeals from the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, following his conviction for the second-degree murder of his former girlfriend Catherine Woods. *See* N.Y. Penal Law § 125.25(1). On appeal, Cortez asserts that the district court correctly determined that his trial counsel performed in an objectively unreasonable manner under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984),

_____

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

2

but erred in concluding that counsel's deficient performance did not prejudice his defense in violation of the Sixth Amendment's guarantee of "effective assistance from his attorney[s] at all critical stages in the proceedings," *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as needed to explain our decision.

## I.      Standard of Review.

We review *de novo* the denial of a section 2254 petition. *Murray v. Noeth*, 32 F.4th 154, 157 (2d Cir. 2022). A federal court may not grant a writ of habeas corpus pursuant to section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), unless (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States," or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 100 (2011). Because Cortez argues only that the New York state courts unreasonably applied clearly established federal law, we limit our discussion to section 2254(d)(1).

3

A decision is an unreasonable application of clearly established federal law if it is "objectively unreasonable, not merely wrong," meaning that "even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted). In other words, the state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 419–20 (internal quotation marks omitted); *see also Brown v. Davenport*, 596 U.S. 118, 136 (2022) ("[Section 2254] asks whether *every* fairminded jurist would agree that an error was prejudicial.").

To succeed on a claim of ineffective assistance of counsel, a petitioner must show that (1) counsel's representation "fell below an objective standard of reasonableness" according to "prevailing professional norms," and (2) "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687–88. Courts will not find prejudice unless "the likelihood of a different result in the absence of the alleged deficiencies in representation [is] substantial, not just conceivable." *Garner v. Lee*, 908 F.3d 845, 849 (2d Cir. 2018) (internal quotation marks omitted). When combined with AEDPA's already "highly deferential"

4

standard, our review is "doubly so."  *Richter*, 562 U.S. at 105 (internal quotation marks omitted).

**II.**  **Cortez Fails to Show that His Trial Counsel's Allegedly Deficient Performance Prejudiced His Defense.**

We begin – and end – with *Strickland*'s prejudice prong.  *See* 466 U.S. at 697; *accord Torres v. Donnelly*, 554 F.3d 322, 327 (2d Cir. 2009) ("As [petitioner] fails to demonstrate prejudice under the second prong of the *Strickland* test, we need not determine whether defense counsel's conduct fell below an objective standard of reasonableness.").  "To establish prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Kovacs v. United States*, 744 F.3d 44, 51 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694).  Where, as here, a habeas petitioner alleges that counsel performed deficiently by failing to investigate or present evidence at trial, a reviewing court must consider "all the relevant evidence that the jury would have had before it," *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (emphasis omitted), including evidence unfavorable to the petitioner. Where the evidence of guilt is "overwhelming," a petitioner will struggle to establish prejudice.  *United States v. Hasan*, 586 F.3d 161, 170 (2d Cir. 2009); *see also,*

*e.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001); *United States v. Reiter*, 897 F.2d 639, 645 (2d Cir. 1990).

Here, the prosecution introduced robust circumstantial evidence establishing Cortez's guilt. A fingerprint matching Cortez's left index finger was found on Woods's bedroom wall, and DNA testing revealed that a bloody smudge overlapping the print contained Woods's blood. Cell-phone records "list[ed] some 14 calls" from Cortez to Woods on November 27, the day of the murder, and "there was proof that of these, several, made between 5:27 p.m. and 6:33 p.m., originated from the vicinity of [Woods's] East 86th [Street] residence." *People v. Cortez*, 22 N.Y.3d 1061, 1062 (2014) (Lippman, C.J., concurring); *see also* App'x at 619; Sp. App'x at 4; Tr. at 604–07. Phone records also revealed that Cortez "stopped calling [Woods] around the time she was killed," App'x at 666, supporting an inference that he was aware of her murder since Cortez had phoned Woods 292 times in the month preceding the murder and often called more frequently at night and in the early morning, when her live-in boyfriend, David Haughn, was at work, Tr. at 1792, 1987–88; App'x at 299. In addition, entries from Cortez's journal showed motive – that he was obsessed with Woods.

The prosecution also introduced evidence that Cortez had lied about his whereabouts on the night of the murder, telling a bandmate that he had missed a scheduled rehearsal at 6 p.m. because "he had overslept" and missed the train, even though cell-site records placed him near Woods's apartment at that time. Tr. at 1004–05. And the prosecution introduced Woods's bed sheets, which contained a bloody boot-print that corresponded to the make and model of a pair of boots that a witness saw Cortez wearing on the night of the murder and which matched Cortez's shoe size (10 ½).

Cortez's arguments to the contrary are unpersuasive. *First*, he contends that his counsel's failure to further investigate the bloody fingerprint found on Woods's apartment wall – and "to call an expert in the field to testify" – "deprived [him] of his right to a fair trial." Cortez Br. at 40. In particular, Cortez focuses on his counsel's failure to follow up with Kenneth Moses, a fingerprint examiner who had been contacted by counsel before trial. But Cortez fails to demonstrate that further investigation by Moses would have helped his cause, let alone that counsel's failure to "follow up" with Moses after an initial consultation, *id.* at 43, prejudiced his defense "beyond any possibility for fairminded disagreement," *Richter*, 562 U.S. at 103. Indeed, Moses *confirmed* that the fingerprint belonged to

Cortez and told counsel that he would need to analyze "the original piece of sheetrock" to determine "whether the print had been placed there before or after the blood stains on the wall." App'x at 203. In other words, whether counsel's failure to follow up with Moses was prejudicial is speculative given that "we cannot even say with confidence what [Moses] might have testified to, if he had taken the stand." *Garner*, 908 F.3d at 869. Such conjecture cannot demonstrate a "reasonable probability that . . . the result of the proceeding would have been different" or "undermine confidence in the outcome" reached at trial. *Kovacs*, 744 F.3d at 51 (internal quotation marks omitted).

The same is true for the post-judgment forensic experts proffered by Cortez to "demonstrate[] the inadequacy of the [prosecution's] fingerprint evidence" at trial. App'x at 641. One set of experts asserted that their post-trial review of the crime-scene photographs revealed "no evidence of a friction ridge impression" – that is, fingerprint markings – "made in either wet or dry blood," suggesting that Cortez's fingerprint was left on the sheetrock "BEFORE [Woods's] blood splattered on that location." Cortez Br. at 55–56 (quoting App'x at 217). Cortez maintains that these findings would have "dramatically undermined the prosecution's case." *Id.* at 56. But Cortez's counsel effectively probed whether

8

the print could have been left before the murder, *see* Tr. at 1895, 1934, and even got the prosecution's forensic witness to admit on cross-examination that he "could not authoritatively establish that Cortez's fingerprint was left in blood, as opposed to having been on the wall before the murder," Sp. App'x at 15; *see also* Tr. at 1934 (defense counsel's summation that "there is no proof beyond a reasonable doubt . . . that [the print] was from that day."). A "fairminded jurist," *Brown*, 596 U.S. at 136, could assume that the jury already considered these alternatives and thus conclude that counsel's failure to further investigate the fingerprint evidence did not prejudice Cortez's defense. Put differently, "[t]his is not a case" where additional development of the fingerprint evidence "would have so clearly altered the entire evidentiary picture that the [state] court's decision is indefensible." *Waiters v. Lee*, 857 F.3d 466, 484 (2d Cir. 2017) (first alteration adopted and internal quotation marks omitted); *see also People v. Cortez*, 85 A.D.3d 409, 412 (1st Dep't 2011) (concluding that "the fingerprint itself provided evidence of [Cortez's] guilt, and when combined with an extensive amount of other circumstantial evidence, it provided overwhelming evidence of [Cortez's] guilt."), *aff'd*, 22 N.Y.3d 1061 (2014).

*Second*, Cortez argues that his defense was prejudiced by counsel's failure to use the video-surveillance footage that allegedly depicted Woods's live-in boyfriend, David Haughn, walking away from their apartment building the night of the murder. According to Cortez, the video's filename, "06 (27-11-05 18'37'52)," established that the video recorded events taking place at approximately 6:38 p.m. App'x at 243. He also contends that the testimony of Woods's neighbor, who reported hearing a disturbance in Woods's apartment between 6:20 p.m. and 6:25 p.m. while on a phone call, *see* Tr. at 209–12, revealed that "Woods was murdered at about 6:25 p.m.," Cortez Br. at 58. Based on these two pieces of evidence, Cortez argues that the footage proves that Haughn must have killed Woods.

We disagree. Even if we assume that the video's file name accurately indicates when it was recorded, the video proves only that Haughn was not in Woods's apartment at 6:38 p.m. – it does not definitively place Haughn *in* the apartment at the time of the murder. And there was still a window of time in which Cortez could have entered the apartment to commit the murder while the neighbor who heard the disturbance was on the phone.

What is more, Cortez's counsel used other evidence to undercut the prosecution's timeline of events. To begin, law-enforcement officers testified that Haughn told them that "he had left the apartment approximately twenty minutes" before dialing 911 at 6:59 p.m., placing his departure around 6:39 p.m. Tr. at 1369. Counsel used this testimony to confront Haughn on cross-examination about whether he told police "that [he] believed [he] had left the apartment about 6:40 p.m." *Id.* at 886. And counsel reiterated this point in closing, emphasizing that "Paul Cortez was not in the apartment [at the time of the murder]. It was David Haughn." *Id.* at 1906; *see also id.* at 1882–83. Given counsel's vigorous (though ultimately unsuccessful) attacks on the prosecution's theory at trial about the timeline of the murder, a fairminded jurist could conclude that the lack of surveillance footage did not prejudice Cortez's defense because the jury already considered and rejected his alternative account of events.

Finally, the footage does nothing to disturb the prosecution's strong circumstantial case – including the aforementioned cell-site location data placing Cortez near Woods's apartment around the time of her murder, cell-phone records that showed repeated calls from Cortez to Woods up until the time of her death and then no calls to Woods following her murder, Cortez's lies to his bandmate

11

and to the police about his whereabouts on the night of the murder, and testimony that Cortez "owned the boot that fit the boot print made in blood." App'x at 666; *cf. Waiters*, 857 F.3d at 480 (underscoring that "habeas relief on the ground of ineffective assistance is generally not warranted" on "a verdict or conclusion with ample record support").

In sum, Cortez fails to satisfy his "heavy burden" of showing that "his attorney's allegedly serious errors at trial merit the grant of habeas relief." *Garner*, 908 F.3d at 865 (internal quotation marks omitted). Because the New York state court did not "appl[y] *Strickland* to the facts of [Cortez's] case in an objectively unreasonable manner," *Bell v. Cone*, 535 U.S. 685, 699 (2002), he is not entitled to habeas relief.

\* \* \*

We have considered Cortez's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the denial of Cortez's petition.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

12