06-4860-pr
*Torres v. Donnelly*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

———————————

August Term, 2007

(Argued: March 26, 2008)                                        Decided: January 30, 2009)

Docket No. 06-4860-pr

———————————

Jesus Torres,

*Petitioner-Appellant*,

*-v.-*

Edward R. Donnelly, Superintendent at Wende Correctional Facility,

*Respondent-Appellee*.

———————————

BEFORE:

FEINBERG, HALL, *Circuit Judges,* and SAND, *District Judge.*[*]

———————————

Petitioner-Appellant Jesus Torres appeals from a judgment entered in the United States District Court for the Western District of New York (Bianchini, Mag. J.) denying a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254 arising from petitioner's state court robbery conviction. We affirm the district court's finding that petitioner did not receive ineffective assistance where defense counsel agreed to stipulate at trial that an identification witness had previously identified the petitioner when defense counsel showed her a photo array prior to trial. Defense counsel's duty to follow ethical guidelines and correct a witness's in-court statements that he knew to be false did not create a conflict of interest with his client such that petitioner was relieved of having to demonstrate that counsel's actions had a probable effect on the outcome of the trial, and petitioner is unable to show prejudice from defense counsel's conduct.

Judgment AFFIRMED.

———————————

_____

[*]The Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

1

FOR PETITIONER:                                   Marjorie M. Smith, Piermont, NY.

FOR RESPONDENT:                            Donna A. Milling and Steven Meyer (*on brief*), *for* Frank J. Clark, Erie County District Attorney, Buffalo, NY.

————————————————

HALL, *Circuit Judge*:

Petitioner-Appellant Jesus Torres appeals from a judgment of the United States District Court for the Western District of New York (Bianchini, Mag. J.) denying his petition for a writ of habeas corpus brought pursuant to 28 U.S.C. §2254. *Torres v. Donnelly*, 454 F. Supp. 2d 75 (W.D.N.Y. 2006). Following a 2001 jury trial in the Supreme Court of New York, Erie County, Torres was convicted of two counts of robbery in the first degree in violation of N.Y. Penal Law § 160.15(4). On direct appeal, Torres raised, *inter alia*, an ineffective assistance of counsel claim. The Appellate Division, Fourth Department, dismissed all of his claims and unanimously affirmed his conviction. *People v. Torres*, 735 N.Y.S.2d 316 (4th Dept. 2001). Here, Torres argues only that he was denied effective assistance of counsel.

The basis of Torres's habeas claim stems from his defense counsel's line of questioning during cross-examination of an identification witness, Anna Rodriguez, which inadvertently elicited testimony counsel personally knew to be inaccurate. Subsequently, to avoid becoming a witness himself and to comply with his ethical obligations to the court to correct false testimony, counsel agreed to stipulate that, contrary to Anna's testimony during cross-examination, Anna had identified Torres when counsel had shown her a photographic array prior to trial. Relying on *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), Torres asserts that defense counsel Thomas Keefe's actions gave rise to an actual conflict of interest that so adversely affected his performance that it was unnecessary

2

to demonstrate resulting prejudice. Torres also asserts that there is a reasonable possibility that, but for the errors of defense counsel, the outcome of his trial would have been different.

## BACKGROUND

Torres was tried for the November 6, 1997 robberies of two grocery stores in Buffalo, New York. Torres does not contest his conviction for the first robbery of a store on Vermont Street. His habeas claim extends only to his conviction on the second robbery, which occurred on Hampshire Avenue. The robbery on Hampshire Avenue was witnessed by Olga Rodriguez, who was behind the counter, Olga's sister, Anna, and her niece, Lisalotte Rodriguez. Lisalotte was not called to testify as a trial witness.

At trial, Olga identified Torres as the robber and testified that she saw him clearly during the robbery. Olga also testified that her sister Anna had been unable to identify the defendant when shown a photo array by detectives. Defense counsel asked Olga, "In your presence, while you were in the store, did a detective with the Buffalo Police Department show a photo to your sister . . . at any time?" Olga responded "She did not identify. She was not paying too much attention that night [of the robbery]."

On cross-examination of Anna, defense counsel sought to build on Olga's testimony and elicit from Anna that she had been unable to identify the defendant in at least one photo array shown to her by police. In response to questioning from defense counsel and the trial court, Anna testified that she had identified the robber in the first photo array she was shown, but that she "couldn't identify [the robber the second time around]." Defense counsel then sought to determine the dates that the police had shown Anna the two photo arrays. Although Anna initially stated that the second photo array had been shown to her in January 1998, upon further questioning she indicated that it had

3

occurred in June 1998, a fact which was clarified and confirmed by the trial court. According to Anna, she did not identify the robber when presented with this second array because she was "so nervous." When the date of the second photo array was confirmed by the court's questioning, however, Attorney Keefe realized that the photo array to which Anna was referring was the one that he had shown her in June or July 1998 as part of his preparation for trial and not one shown to her by police. He interjected and clarified to the court that he in fact had been in the store in June or July 1998 and presented a photo array to Anna. On redirect examination, Anna repeated that she did not identify Torres when Attorney Keefe showed her an array because she was nervous. Contrary to Anna's testimony, however, Attorney Keefe knew that Anna *had* identified Torres when he had shown her the photo array.

Later, in a colloquy outside the presence of the jury, the prosecutor argued that it was important to clarify to the jurors what Anna had told Attorney Keefe about the photo array. He asserted that by showing her the photo array, Keefe had essentially made himself a witness in the case. Upon questioning by the trial court, and because of Attorney Keefe's ethical obligation not to "knowingly use . . . false evidence," Keefe ultimately informed the court that Anna had identified Torres when Keefe showed her the photo array in June or July 1998. Keefe explained that he had pursued his line of questioning under the mistaken belief that the police had shown Anna two sets of photo arrays on separate occasions.

To avoid the complications of defense counsel being called to the stand and possibly obtaining different counsel for Torres, the trial court suggested, and Attorney Keefe agreed to, the following stipulation, which the court then read to the jury:

4

Both parties are concerned that there may be confusion over Anna Rodriguez's testimony with regard to photo arrays. To clarify this issue over what photo array was shown to her, we, the attorneys, stipulate that on or about June or July of 1998, attorney Thomas Keefe . . . showed her . . . a photocopy of one of the arrays, and asked her if she could identify the robber . . . The witness did identify the robber as number 3 . . ..

After deliberations, the jury convicted Torres on both counts of robbery.

On direct appeal from the conviction, the Appellate Division for the Fourth Department affirmed Torres's conviction. As to counsel's cross-examination of Anna and resulting stipulation, it found that:

> [D]efense counsel's stipulation advising the jury that a witness identified defendant in a photo array shown to her by defense counsel was not an egregious error that denied defendant effective assistance of counsel. Defense counsel reasonably believed that the witness had been shown two photo arrays by police; during cross examination the witness testified that she identified defendant in the first photo array but not in the second photo array. During the course of the witness's testimony, defense counsel realized the "second" photo array to which the witness referred was the photo array that he had shown the witness, and therefore the testimony of the witness that she did not identify defendant in that photo array was not true. Defense counsel could not "knowingly use...false evidence" (Code of Professional Responsibility DR 7-102[a][4] [22 NYCRR 1200.33(a)(4)]) and thus was required to report the incorrect testimony to the court. Defense counsel's alternative to the stipulation was to testify as a witness, which would have required new counsel for defendant.

*People v. Torres*, 735 N.Y.S.2d 316, 318-19 (App. Div. 4th Dep't 2001). Thereafter, the New York Court of Appeals denied Torres leave to appeal. *People v. Torres*, 97 N.Y.2d 762 (2002).

## DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act, where a state court has adjudicated the claim on the merits, a federal court may only grant a writ of habeas corpus if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal

5

law, as determined by the Supreme Court of the United States," 28 U.S.C. §2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," 28 U.S.C. §2254(d)(2).

To establish that counsel's performance was constitutionally defective, a defendant must show that "the lawyer's performance 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.'" *Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). *Strickland* made clear that even if counsel's performance is found professionally unreasonable, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 692. Therefore, the question becomes "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. In certain circumstances, however, prejudice may be presumed, and an individual inquiry regarding this factor is unnecessary. *See id.* at 692 (noting that where a defendant shows "actual or constructive denial of assistance of counsel . . . [or] state interference with counsel's assistance . . . prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost"). Similarly, the Supreme Court has recognized that when a criminal defendant claims that defense counsel was "burdened by an actual conflict of interest," this warrants a "limited presumption of prejudice." *Id.* In these instances, the presumption of prejudice attaches "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)).

6

Torres argues that the limited presumption recognized in *Sullivan* is applicable to his case such that he is not required to demonstrate he was prejudiced by his counsel's performance. We disagree. Although Keefe had parallel duties to zealously represent his client and not to use false evidence, this did not create an actual conflict of interest under *Sullivan*. Though the *Sullivan* presumption has been "unblinkingly" applied to "all kinds of alleged attorney ethical conflicts," *Sullivan*'s discussion of it does not support this expansive application. *Mickens v. Taylor*, 535 U.S. 162, 174 (2002). The Supreme Court made clear in *Mickens* that the presumption was created to account for the "high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice." *Id.* at 175. However, "[n]ot all attorney conflicts present comparable difficulties." *Id.*; *see also Smith v. Hofbauer*, 312 F.3d 809, 816 (6th Cir. 2002) (citing *Mickens*, 535 U.S. at 175-76) (remarking that *Sullivan* has "never been extended by the Supreme Court to conflicts other than joint representation"). Here, defense counsel's ethical obligation to correct the testimony he knew to be inaccurate does not present the difficulties and high probability of prejudice engendered by joint representation. At most, in this case defense counsel's earnest representation of his client was constrained by ethical guidelines applicable to every attorney appearing as trial counsel, to wit, that "[i]n the representation of a client, a lawyer shall not:...(4) knowingly use perjured or false evidence." *See* N.Y. Code of Prof'l Responsibility DR 7-102(a)(4), N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.33(a)(4).

Accordingly, we hold that the tension between Keefe's parallel duties of (1) zealous representation and (2) candor to the court, which gives rise to his obligation to correct the record, did not create a conflict of interest of the sort identified in *Sullivan*. This holding "is consistent with the governance of trial conduct in what we have long called 'a search for truth.'" *Nix v. Whiteside*, 475

7

U.S. 157, 171 (1986) (rejecting the application of the *Sullivan* presumption to defendant's asserted "conflict" between defendant's desire to use false testimony and counsel's professional ethical obligations). Indeed, "an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct; it specifically ensures that the client may not use false evidence." *Id*. at 168.

We further find no actual conflict of interest inherent in counsel's decision to enter into the stipulation to correct the record. It is clear that several methods, such as calling as a witness the interpreter who was present when Attorney Keefe showed Anna the photo array, were available to accomplish this necessary task. Each of them, in order to correct the misstatement, would have yielded the same result.

Because Torres does not and cannot show a conflict of interest cognizable under *Sullivan*, he must demonstrate that he was prejudiced in fact as a result of defense counsel's conduct. *See Strickland*, 466 U.S. at 694. That he did not do. Neither party mentioned the stipulation in their summations, and there was sufficient independent evidence before the jury on which to rest the verdict. This included Anna's initial identification of Torres to the police, the identification of Torres in a photo array by Olga, and Olga's unequivocal identification of Torres at trial. Torres cannot show that a reasonable probability exists that, but for counsel's conduct, he would not have been convicted. As Torres fails to demonstrate prejudice under the second prong of the *Strickland* test, we need not determine whether defense counsel's conduct fell below an objective standard of reasonableness. *See id.* at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing in one."). For these reasons we find that Torres was not denied effective assistance of counsel.

8

**CONCLUSION**

We have considered all of Torres's other arguments and find them to be without merit. For the reasons stated above, the judgment of the district court is AFFIRMED.