NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0255n.06

No. 16-2106

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 23, 2018
DEBORAH S. HUNT, Clerk

MARLAN MCRAE,                                              )
                                                          )
        Petitioner-Appellant,                             )
                                                          )   ON APPEAL FROM THE
v.                                                        )   UNITED STATES DISTRICT
                                                          )   COURT FOR THE WESTERN
UNITED STATES OF AMERICA,                                 )   DISTRICT OF MICHIGAN
                                                          )
        Respondent-Appellee.                              )
                                                          )

**BEFORE: DAUGHTREY, GIBBONS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Petitioner-Appellant Marlan McRae was convicted of conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a) and § 846. McRae moved to vacate his conviction under 28 U.S.C. § 2255, asserting ineffective assistance of counsel. The district court denied the motion, and we **AFFIRM**.

I.

McRae was charged with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine for his part in a chain conspiracy that involved the delivery of cocaine from California to Detroit for distribution throughout Michigan. Represented by attorney Marvin Barnett, McRae was tried with two of his co-defendants, Dr. Owusu Firempong and Roberto Farias.

Several of McRae's co-defendants pleaded guilty and testified against McRae at trial. Co-defendant James Dylan Hayes testified that two other co-defendant suppliers shipped him an

average of 70 kilograms of cocaine per month from the late 1990s until 2007, and that he supplied McRae with 10-to-20 kilograms of cocaine from each 70-kilogram shipment he received. Hayes estimated that, from the late 1990s until 2007, he supplied McRae with a total of more than 500 kilograms of cocaine from these shipments.

Hayes' brother, Alvin Anderson, testified that he, too, delivered cocaine to McRae. Both Hayes and Anderson testified that they primarily delivered cocaine to McRae at a house on Hamburg Street in Detroit, but occasionally met McRae at other locations around the city. Anderson kept a handwritten ledger, admitted into evidence, showing that Anderson delivered twenty-nine kilograms of cocaine to McRae.

Officer Michael Patti of the Detroit Police Department testified that on July 6, 2006, officers executed a search warrant at the house on Hamburg Street, and found a large amount of cash, cocaine, heroin, marijuana, several handguns, and multiple safes. McRae stipulated that one of the safes contained a brown paper bag that had two of his fingerprints on it and contained two bricks of cocaine. Tommie Hodges, a federal inmate serving a marijuana-trafficking sentence at the time of trial, also testified. Hodges was not a member of the charged conspiracy, but was McRae's friend since elementary school. Hodges testified that he saw McRae daily from the mid-1990s until approximately 2002 and witnessed McRae receive distribution-quantities of cocaine and marijuana on numerous occasions. Hodges saw McRae cook cocaine into crack-cocaine, sell crack-cocaine, and, on one occasion, possess five-to-ten kilograms of cocaine. Hodges' testimony was only relevant to McRae; he presented no evidence regarding any other co-defendant.

On cross-examination, Attorney Barnett asked Hodges whether he received anything in exchange for his cooperation. Hodges responded that he received a sentence reduction for

assisting in the investigation of the murder of a federal witness in an unrelated case. On redirect, the government asked Hodges to describe that assistance, and in response, Hodges invoked his Fifth Amendment privilege against self-incrimination. Outside the presence of the jury, Hodges stated he would continue to invoke the Fifth Amendment in response to any question concerning his assistance. The district court appointed counsel to advise Hodges.

After further discussion, the district court ruled that Hodges had no Fifth Amendment privilege regarding any cooperation he provided during the murder investigation. The government proposed that the Court strike Hodges' redirect testimony and take his plea agreement out of evidence. Counsels for co-defendants Farias and Firempong moved for a mistrial. Barnett opposed the motion for a mistrial, asserting that there was no basis for that remedy, and instead asked the court to strike Hodges's testimony in its entirety. The court adopted Barnett's proposed remedy, reasoning that mistrials are to be granted only in "striking and extraordinary circumstances" and that a curative instruction could remedy the situation. The court instructed the jury as follows:

> Ladies and gentlemen of the jury, earlier during this trial you heard the testimony of Tommie Hodges. I instruct you that you are to disregard entirely the testimony of Tommie Hodges from your consideration of this case. You should consider this case as if he had not testified.

[R.774, Tr. Trans. vol. IX at 7552–53].

On May 12, 2011, the jury found McRae guilty of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1).[1] On November 11, 2011, the district court sentenced McRae to a 235-month term of imprisonment and entered a

_____

[1] The jury also found Firempong guilty of participating in the drug conspiracy and a related money-laundering conspiracy. The jury acquitted Farias.

$17,280,000 forfeiture judgment against him. McRae appealed his conviction and this court affirmed. *United States v. Logan*, 542 F. App'x 484, 501 (6th Cir. 2013).

## II.

It appears that Attorney Barnett committed several ethical violations during trial. First, after Hodges invoked the Fifth Amendment, counsel for McRae's co-defendants informed the district court that Barnett had attempted to intimidate Hodges through Hodges' appointed counsel. Specifically, the attorneys asserted that Barnett told Hodges' counsel that he wanted "to give a message" to Hodges. The "message" was that if Hodges did not continue to invoke his Fifth Amendment privilege, Barnett would ensure that the transcript of his testimony, including any testimony about his cooperation, would become unsealed, and therefore available to the public, and that cooperating witnesses like Hodges get "assassinated" when such information about their cooperation becomes public.

Additionally, according to affidavits filed by McRae and his wife, McRae asked Barnett to move for a mistrial after Hodges invoked the Fifth Amendment, but Barnett refused to do so unless McRae paid him an additional $50,000 to retry the case. After McRae told Barnett he could not pay the additional $50,000, Barnett opposed co-defendants' motion for a mistrial.

In 2014, Judge Paul Maloney, who had presided over the trial, filed a formal complaint against Barnett with the Michigan Attorney Grievance Board ("the Board"), citing the allegations of misconduct during McRae's trial. The Board also received unrelated complaints against Barnett in two separate matters and held a formal hearing at which Judge Maloney was a witness. When asked about the events immediately following Hodges' Fifth Amendment invocation, Judge Maloney testified:

> I was anticipating motions for mistrial . . . . I ruled that the invocation
> of the Fifth Amendment was improper under the law, because I didn't

> see anything about the factual material that the witness did not want
> to talk about in any way implicated him in a crime. So I ruled that it
> was an improper invocation of the Fifth Amendment, and given trial,
> I anticipated motions for mistrial from the defense lawyers.

[R.3-6 at PID 138]. Counsel for the Attorney Grievance Commission noted that counsel for

McRae's co-defendants moved for a mistrial and asked if those motions were denied "because

the testimony did not go to their clients," to which Judge Maloney responded:

> Correct. Mr. – that's absolutely correct. I didn't think there was any
> substantial prejudice to Dr. Firempong or Mr. Farais in light of the
> nature of [Hodges'] testimony.
>
> Of course, they made an argument which I thought was weak that,
> well, it is basically guilt by association here. I didn't think that
> merited a mistrial.
> . . .
>
> [Counsel for the Attorney Grievance Commission]: [T]aking the
> totality of the circumstances into consideration, if Mr. Barnett had
> filed a motion for mistrial, do you believe it would have been based
> on – grounded on fact and law?
>
> [Judge Maloney]: Oh, certainly there was an argument – certainly
> there was an argument on behalf of Mr. McRae for a mistrial.

[*Id.* at PID 138, 145].

The Board suspended Barnett's license for three years. Among other findings, the Board

found that Barnett had engaged in misconduct during McRae's trial and ordered Barnett to pay

McRae $47,000 in restitution.

III.

McRae asserted an ineffective-assistance-of-trial-counsel claim on direct appeal based on

Barnett's refusal to move for a mistrial without payment. This court determined that the claim

should be pursued in a habeas petition, and McRae filed this timely motion to vacate his

conviction under 28 U.S.C. § 2255. Rejecting McRae's argument that he is entitled to a

presumption of prejudice based on Barnett's conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the district court held that *Strickland v. Washington*, 466 U.S. 668 (1984), provides the applicable standard for evaluating McRae's ineffective-assistance-of-counsel claim. The district court found that McRae could not demonstrate prejudice under that standard and denied habeas relief without an evidentiary hearing. This court granted McRae a Certificate of Appealability regarding his ineffective-assistance-of-counsel claim arising from Barnett's alleged extortion attempt, which arguably involved a conflict of interest between Barnett's own pecuniary interest and the duty of loyalty he owed to McRae.

IV.

Ineffective-assistance-of-counsel claims are mixed questions of law and fact and are reviewed de novo. *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006). Although a district court's decision not to conduct an evidentiary hearing is reviewed for abuse of discretion, an evidentiary hearing "is required unless the record conclusively shows that the petitioner is entitled to no relief." *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012).

V.

The Sixth Amendment affords criminal defendants the right to assistance of counsel because of the effect that assistance "has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658 (1984). "Derivative of the right to counsel under the Sixth Amendment is the right to have counsel provide effective assistance, and assistance which is ineffective in preserving fairness does not meet the constitutional mandate." *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003) (citations omitted). The Sixth Amendment right to counsel includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981).

Generally, a defendant alleging ineffective assistance of counsel must demonstrate both (1) that counsel's performance was constitutionally deficient and (2) "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A "reasonably probability" means "a probability sufficient to undermine confidence in the outcome." *Id.* However, in certain circumstances, courts "will discharge the defendant's *Strickland* obligation to demonstrate a probable effect on the outcome and instead presume such prejudice." *Moss*, 323 F.3d at 455 (citations omitted). Courts will presume prejudice when: (1) a defendant is completely denied counsel "at a critical stage" of trial; (2) counsel fails to "subject the prosecution's case to meaningful adversarial testing"; or (3) counsel "is called upon to render assistance where competent counsel very likely could not." *Id.* (citing *Cronic*, 466 U.S. at 658–59).

The "presumption of prejudice" also applies in particular circumstances when defense counsel operates under a conflict of interest. In *Holloway v. Arkansas*, 435 U.S. 475 (1978) and *Cuyler v. Sullivan*, 446 U.S. 335 (1980), two cases in which one attorney represented multiple co-defendants, the Supreme Court held that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Sullivan*, 446 U.S. at 349–50 (citing *Holloway*, 435 U.S. at 487–91). In the multiple-representation context, if a defendant objects to the conflict prior to or during trial, the trial court must inquire regarding the extent of the conflict, or subject any subsequent conviction to automatic reversal. *Holloway*, 435 U.S. at 489–92. In the absence of an objection, a showing of an actual conflict and its adverse effect on counsel's performance will void the conviction. *Moss*, 323 F.3d at 455 (citing *Mickens v. Taylor*, 535 U.S. 162, 174–75 (2002)).

A.

The first question is whether the district erred in declining to apply *Sullivan*'s presumption of prejudice to the pecuniary conflict at issue here. We conclude that it did not; McRae's petition is properly analyzed under the *Strickland* standard. Neither the Supreme Court nor the Sixth Circuit has applied *Sullivan* to this type of conflict. *See Faison v. United States*,

650 F. App'x 881, 889 (6th Cir. 2016) ("This Court has yet to apply *Sullivan*, a higher standard than *Strickland*, to a fee dispute.") (citing *Mickens*, 535 U.S. at 176). Nevertheless, McRae argues we should apply *Sullivan* because Barnett actively represented his own conflicting interest when he demanded an additional $50,000 to retry the case and opposed mistrial when McRae could not pay.

The Supreme Court has explicitly cautioned against "appl[ying] *Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts.'" *Mickens*, 535 U.S. at 174 (citation omitted). *Mickens* involved successive (rather than multiple) representation. Summarizing lower court cases, the Court disapprovingly cited opinions that:

> [I]nvoked the *Sullivan* standard not only when (as here) there is a conflict rooted in counsel's obligations to *former* clients, but even when representation of the defendant somehow implicates counsel's personal or financial interests, including a book deal, a job with the prosecutor's office, the teaching of classes to Internal Revenue Service agents, a romantic "entanglement" with the prosecutor, or fear of antagonizing the trial judge.

*Id.* at 174–75 (citations omitted). Because "the language of Sullivan itself does not clearly establish, or indeed even support, such expansive application," the Court warned that "[t]he purpose of [the Supreme Court's] *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland* . . . is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." *Id.* at 175, 176 (citations omitted).

In the sixteen years since *Mickens* was decided, circuit courts have been hesitant to apply *Sullivan*'s presumption outside the multiple- or serial-representation context. *See, e.g.*, *United States v. Young*, 315 F.3d 911, 915 n.5 (8th Cir. 2003); *United States v. Mota-Santana*, 391 F.3d 42, 46 (1st Cir. 2004); *Whiting v. Burt*, 395 F.3d 602, 619 (6th Cir. 2005); *United States v.*

*Goodley*, 183 F. App'x 419, 422 (5th Cir. 2006); *Cruz v. United States*, 188 F. App'x 908, 913–14 (11th Cir. 2006); *Torres v. Donnelly*, 554 F.3d 322, 325–26 (2d Cir. 2009); *United States v. Williamson*, 859 F.3d 843, 856 (10th Cir. 2017).  Weighing further against the extension of *Sullivan* here is the rationale behind it: in cases of multiple representation, "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests." *Strickland*, 466 U.S. at 692; *see also Mickens*, 535 U.S. at 175 ("Both *Sullivan* itself and *Holloway* stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice.  Not all attorney conflicts present comparable difficulties.") (internal citations omitted).

Here, assuming Barnett actively represented conflicting interests when he demanded an additional $50,000 to retry the case, McRae can point to a measurable harm: Barnett's failure to move for a mistrial.  This is not the type of conflict that evades vindication under *Strickland*'s prejudice requirement.  *See United States v. Walter-Eze*, 869 F.3d 891, 906 (9th Cir. 2017) ("Thus, even if *Sullivan*'s presumption of prejudice can extend . . . to the type of circumstances implicating counsel's financial interests as are faced here, this is not a case where the presumption applies. . . . [W]here, as here, the actual conflict is relegated to a single moment of the representation and resulted in a single identifiable decision that adversely affected the defendant, the Supreme Court's reasoning regarding when prejudice should be presumed does not control.").

Because there is no difficulty identifying the specific harm caused by the conflict here, and because the Supreme Court directed courts to exercise restraint in extending *Sullivan* to conflicts that do not involve multiple representation, we conclude the district court correctly declined to apply *Sullivan*'s presumption of prejudice to this case.

B.

Under *Strickland*, McRae must demonstrate (1) Barnett's performance was deficient; and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694.

Barnett's decision to push for the exclusion of Hodges' testimony rather than move for a mistrial would normally be entitled to deference.[2] *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). Nevertheless, in assessing counsel's performance, this court may consider "the skills a lawyer should possess, *the guidelines of professional organizations such as the ABA*, and the specific circumstances of each case." *Id.* at 551 (emphasis added) (citation omitted). Under the ABA's canons of professional ethics, "[a] lawyer's own interests should not be permitted to have an adverse effect on representation of a client." Comment 10, Model Rules of Prof'l Conduct R. 1.7 (2013); *see also Rickman v. Bell*, 131 F.3d 1150, 1154–55 (6th Cir. 1997) ("Indicia of objective unreasonableness include the violation of 'certain basic duties' inherent in the representation of a criminal defendant, among them a 'duty of loyalty' to the client, from which derive 'the overarching duty to advocate the

---

[2] "Strickland cautions [] that any court applying this analysis must do so with tremendous deference to trial counsel's decisions. . . [T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). Here, it would have been reasonable for counsel to conclude that the option of striking Hodges' testimony in its entirety was preferable to a retrial in which Hodges might be pressured to testify under threat of contempt. However, because Barnett injected his financial interests into the equation, we do not know what he thought was the best strategic outcome. He may have thought a mistrial was best but opposed it to avoid the need to devote time to the retrial without additional payment; or he may have thought that having Hodges' testimony stricken in its entirety was preferable, but he saw an opportunity to obtain an extra $50,000, and so was willing to move for a mistrial, provided he was paid. Under the circumstances, because Barnett was pursuing his own financial interests, there was no exercise of professional judgment deserving of deference.

defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.'") (citing *Strickland*, 466 U.S. at 688).

We therefore assume that Barnett's performance in demanding money and opposing the mistrial was deficient. McRae must still show a reasonable probability that "the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. The district court found McRae could not demonstrate prejudice because:

> Even if McRae had been given a new trial, there is no reason to believe that the outcome would have been different. There was substantial evidence of McRae's guilt aside from Hodges testimony: Hayes and Anderson both testified to supplying McRae with cocaine, and officers found cash, guns, and drugs in McRae's house, along with McRae's fingerprints on a bag of cocaine.

[R.34 at PID 313]. In essence, the district court found that even if McRae could show that Judge Maloney would have granted a motion for mistrial—which is not at all clear—the overwhelming evidence of McRae's guilt made it impossible to establish prejudice. *See Mickens*, 535 U.S. at 166 ("[D]efects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation."); *Sylvester v. United States*, 868 F.3d 503, 511–12 (6th Cir. 2017) (finding that, although counsel's failure to move to dismiss due to a Speedy Trial Act violation constituted deficient performance, the defendant could not demonstrate prejudice because he could not show that the court would have dismissed the indictments with prejudice).

We agree that the substantial evidence of McRae's guilt makes it difficult for him to demonstrate prejudice, but "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *See Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Although overwhelming evidence of guilt may offer a reviewing court confidence in the reliability of the proceeding, it

does not necessarily establish fairness. Our Sixth Amendment analysis, therefore, cannot rest solely on the weight of the evidence against McRae.

Here, the only allegation that Barnett's performance was deficient stems from Barnett's refusal to move for a mistrial. Barnett's actions were clearly unethical, but those actions did not render the trial fundamentally unfair. Although Judge Maloney stated he thought McRae could have made "an argument" for mistrial, he also explained that such a remedy "should be reserved for 'extraordinary and striking circumstances.'" [R. 774 at PID 7435] (citing *Renico v. Lett*, 559 U.S. 766, 784 (2010)). And even after Barnett's extortion attempt, he continued to vigorously represent McRae and, over government objection, successfully moved to strike Hodges' entire testimony, which would have been particularly damaging to McRae. The court then gave an adequate curative instruction. On balance, we cannot say that Barnett's failure to move for a mistrial "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

## VI.

For the foregoing reasons, we **AFFIRM** the district court's judgment.